## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHANIE GREEN on behalf of            )
her minor children,                     )
et al.                                  )
                                        )    **Civil Action No. 18-289 Erie**
                    Plaintiff,          )
                                        )
          v.                            )
                                        )
LARRY MANROSS, City Manager             )
of Titusville PA, et al.,               )
                                        )
                    Defendants.         )

## <u>MEMORANDUM OPINION</u>

**Susan Paradise Baxter, United States District Judge**

The within civil action arises out of a dispute between local officials and Plaintiffs

Stephanie Green ("Green") and Michael Restivo ("Restivo") concerning Plaintiff's use and

occupancy of a residence located in Titusville, Pennsylvania. The remaining Defendants in the

case are Titusville City Code Enforcer Timothy Lorenz ("Lorenz"), Titusville Police Chief

Harold Minch ("Minch"), and Titusville police officer Glen Ciccarelli ("Ciccarelli"). These

Defendants have moved for summary judgment on all of Plaintiffs' remaining claims.  For the

reasons that follow, Defendants' motion will be granted.

**I.      <u>Background</u>[1]**

    *A.  Relevant Legal Background*

---

[1] The following facts are derived from Defendants' Concise Statement of Material Facts in Support of their Motion for Summary Judgment and Plaintiff's responses thereto (collectively referred to as "DCSMF"), ECF Nos. 82 and 85, as well as Plaintiffs' counterstatement of material fact and Defendants' responses thereto (collectively, "PCMF"), ECF No. 85 and 86.  Where relevant, the Court also cites public law as well as exhibits and deposition testimony in the record. Except as otherwise noted herein, the following facts are not genuinely disputed.

In 1999, the Commonwealth's General Assembly enacted the Pennsylvania Construction Code Act ("PCCA").  *See* Act of November 10, 1999, P.L. 491, as amended, 35 Pa. Stat. Ann. §§7210.101–7210.1103 (West).  The PCCA was designed to, among other things, "insure uniform, modern construction standards and regulations throughout the Commonwealth for the protection of life, health and property and for the safety and welfare of consumers, the general public and the owners and occupants of buildings and structures." *Schuylkill Twp. v. Pennsylvania Builders Ass'n*, 935 A.2d 575, 577 (Pa. Commw. Ct. 2007) (citing 35 Pa. Stat. Ann. § 7210.102) (West)) (footnote omitted), *aff'd* 7 A.3d 249 (Pa. 2010).  To that end, Section 301(a)(1) of the PCCA directed the Department of Labor and Industry (the "Department") to promulgate regulations adopting "the 1999 BOCA National Building Code, Fourteenth Edition" (hereafter, "BOCA Building Code") as a "Uniform Construction Code" 35 Pa. Stat. Ann. §7210.301(a)(1) (West).  The Department has done so, and its Uniform Construction Code ("UCC") provisions are now codified at Title 34 of the Pennsylvania Code, Part XIV.  *See* 34 Pa. Code. §§ 401.1 et seq.

"The [PCCA] applies generally to the construction, alteration, repair and occupancy of all buildings in the Commonwealth and preempts the establishment of different construction standards by local ordinance." *Schuylkill Twp*., 935 A.2d at 577 (citing 35 Pa. Stat. Ann. §7210.104(a) and (d)).  Municipalities may, however, enact ordinances that equal or exceed the minimum requirements of the UCC. *See* 35 Pa. Stat. Ann. §7210.503 (West); *Schuylkill Twp*., 935 A.3d at 577.  In addition, the PCCA gives municipalities various options relative to the administration and enforcement of the Act, including the option to administer and enforce the provisions of the Act themselves through the appointment of a responsible municipal code official. *See* 35 Pa. Stat. Ann. § 7210.501(b)(1). Where a municipality elects self-enforcement, it

is statutorily required to establish a board of appeals to hear appeals from the decisions of its code administrator. *Id.* at §7210.501(c)(1).

By municipal ordinance, the City of Titusville has adopted the Pennsylvania UCC and the provisions of the BOA Building Code. *See* ECF No. 82-23 at 1 (UCC §1707.02); ECF No. 82-24 at 1 (Building Code §1709.01). The City has also elected to self-administer and enforce the provisions of the PCCA. ECF No. 82-23 at 1 (UCC §1707.01).

At times relevant to this case, Defendant Lorenz held the title of Building Inspector for the City of Titusville and was responsible for the enforcement of municipal and state laws concerning building construction, renovations, and property maintenance. ECF No. 82-7, ¶¶1-3. As it relates to this action, Lorenz was the official responsible under local ordinance for enforcement of the City's building and housing codes which entailed, among other things, issuing building permits, conducting inspections to ensure compliance with any code requirements, issuing any necessary notices or orders, and assessing whether residences within the City of Titusville were safe and suitable for human habitation. *See* ECF No. 82-26 (Building Code §§1705.01(a), 1705.03, 1705.05, 1705.06); ECF No. 82-23 (UCC Code §1707.03); ECF No. 82-24 (Building Code §§1709.04 and 1709.06); ECF No. 82-25 (Housing Code §§1905.01, 1905.02, 1905.05); ECF No. 82-27 (Housing Code §1907.01); ECF No. 82-8, Lorenz Depo at 9:1-7, 11:11-14; ECF No. 82-7, ¶4. Following the Commonwealth's adoption of the Pennsylvania UCC, the City of Titusville utilized the services of a third-party inspector. ECF No. 82-8, Lorenz Depo. at 10:22-11:6.

### B. Factual Background

In October 1994, Chris and Eva Tharp purchased a home located at 307 North Martin Street in the City of Titusville, Crawford County, Pennsylvania (hereafter, the "North Martin

Street Property" or "Property"). DCSMF ¶1. The Tharps resided at the Property until sometime around 2013 or 2014 when they moved out due to the presence of black mold. Thereafter, they stopped paying taxes on the Property. *Id.* ¶¶2-3. On September 23, 2016, the North Martin Street Property was subjected to a Tax Upset Sale to Crawford County. *Id.* ¶¶3, 4.

In or around the summer of 2017, the City of Titusville was notified about the dilapidated and dangerous condition of the rear addition to the home on the Property, which was at risk for collapse. DCSMF ¶14. Because the Tharps had abandoned the Property with no intention of repairing the dangerous condition, employees of the City of Titusville undertook the demolition of the rear addition with the Tharps' permission. *Id.* ¶¶15-16. After demolishing the rear addition, the city employees boarded up the back of the residence, which would have otherwise been open to the elements. *Id.* ¶15. Removal of the rear addition resulted in numerous electrical wires and plumbing lines being exposed, which were largely contained within the crawlspace area of the basement. *Id.* ¶17.

In May of 2018, Green and Restivo began searching for a home in Titusville that they might live in together, along with Green's children. DCSMF ¶¶6-9. Green became interested in purchasing the Property after seeing it on a list of "county-held" properties. *Id.* ¶10. Plaintiffs attempted to contact the Crawford County Treasurer, Christine Krzysiak ("Krzysiak"), concerning the Property on or about June 17, 2018, but they were unable to speak with Krzysiak at that time. *Id.* ¶11.

Plaintiffs first accessed the North Martin Street Property on June 21, 2018 by entering a "hole" at the back of the house. DCSMF ¶13. At the time Plaintiffs first gained entry, the "whole back wall of the house was gone," and there was no running water and no electricity. *Id.* ¶¶13, 18. Various wires and plumbing lines were exposed, the house had sustained water

damage, and there were problems with the floors, the foundation, the walls, and the roof. DCSMF ¶18.  Plaintiffs began to occupy the North Martin Street Property as of June 21, 2018, but they did not then live there full time.  *Id.* ¶25.

That same month, Lorenz received an inquiry about the status of the Property from a neighbor who noted that it appeared someone was living there.  DCSMF ¶31.  Lorenz was familiar with the home because he had been involved in the demolition work that had been performed in 2017.  *Id.* ¶30.  He was therefore aware that the demolition had left numerous electrical wires and plumbing lines exposed.  ECF No. 82-7, ¶11.  According to Lorenz, the remaining interior floors of the house were in extremely poor condition, such that a person could fall through them if stepping with sufficient force.  *Id.* ¶12.  The rear of the house was boarded up, but numerous gaps remained between the boards, leaving the interior of the residence largely exposed to the elements.  *Id.* ¶13.  Lorenz considered the house unfit for human habitation at that point but did not begin a process of formal condemnation because the structure had been vacant, was being held by the County as a tax-delinquent parcel and was not in danger of imminent collapse. *Id.* ¶14; ECF No. 82-8, Lorenz Depo. at 82:21-83:4.  He "thought that it was going to make somebody a pretty good house," but felt it "still needed some care" before it could be occupied.  Lorenz Depo. at 83:4-8.

Lorenz visited the Property on Friday, June 22, 2018, at which time he encountered Green, who answered the door in a bathrobe. DCSMF ¶32.  Green denied that she was living there but indicated that she intended to purchase the Property and had placed a bid on it.  *Id.* ¶33. Noticing that the electricity had been turned on, Lorenz checked the fuse panel and saw that the electrical system had passed a third-party inspection.  *Id.* ¶¶34-35.

Later that day, Lorenz reached out to Krzysiak via email.  Lorenz noted that

> a woman appeared to be living in a house that has been vacant for quite some time and we had no request to have the water turned on.  When I checked it out, a woman named Stephanie Green said that she was buying it from County repository.  She said that she got the key from you and that it may take a year to get title.  Can you let me know if this is accurate?  . . .

ECF No. 82-6 at 1.  Krzysiak replied:

> This is not true.  We have this property as a county held property.  It has not been through a Judicial Sale and therefore is not even in repository.  It if was, it would only take 30-45 days to get the deed.

> We have not accepted any offers on this property . . . .

*Id.*

Lorenz followed this discussion up with an email to Green the following Monday morning, June 25, 2018.  Lorenz wrote:

> I contacted the Crawford County Court house and they informed me that the property at 307 N. Martin St., where we spoke last Friday, is County held and would not reach repository until it has made it through Judicial Sale.  That sale has yet to take place.  Therefore, you have no legal standing in the matter and must vacate the premises immediately and discontinue any repairs you are making to the structure.  If you fail to do so I will be forced to take legal action against you.

ECF No. 82-6 at 2.  Green advised in a reply email that Restivo had been at the courthouse the previous Friday afternoon, and she could "only assume that one of us has been misinformed." *Id.* at 3.  After Lorenz forwarded Green's reply to Krzysiak, ECF No. 82-6 at 3, Krzysiak confirmed that "[s]omeone named Michael Restivo was in on Friday to inquire about the price," but Krzysiak had not yet called him back.  *Id.*

A few days later, Lorenz returned to the Property, where he observed a significant amount of electrical wiring and plumbing pipe piled on the lawn.  DCSMF ¶41. He surmised from this that the wiring and piping had been ripped out and that Plaintiffs must be doing extensive work to the electrical and plumbing systems in the house.  *Id.* ¶¶41-42.  According to Lorenz, this raised several concerns.  First, Lorenz believed there could be a fire risk based on

the fact that Restivo was not an electrician but had apparently ripped out a significant amount of the wiring that had previously been approved by an inspector. *Id.* ¶43. Second, Lorenz also had concerns that any issues with the plumbing might present unsanitary and unsafe conditions. *Id.* ¶44. Third, Lorenz believed that Restivo had no legal right to perform repairs to the structure and had undertaken repairs prior to obtaining the necessary permits. *Id.* ¶45. Upon observing the piles of wiring and piping, Lorenz advised Restivo that he should not be altering the electrical system. *Id.* ¶46. Restivo told Lorenz that he wanted to secure a permit for the work he was doing, but Lorenz refused to inspect the work or provide a permit. *Id.* ¶47.

On June 29, 2018, Restivo submitted a bid on the Property in the amount of $3,100.00. DCSMF ¶¶50-51. Restivo also signed a Proposed Private Sale of Tax Claim Land, which indicated that notices would be sent to interested parties concerning the proposed sale and, if no objections to the sale were received, the sale would occur on September 23, 2018. *Id.* ¶52. Plaintiffs and Green's two minor children moved into the home on the North Martin Street Property during the first week of July 2018. *Id.* ¶55.

The next contact between Lorenz and Plaintiffs occurred on July 11, 2018 when Lorenz, having received reports of the Plaintiffs living at the Property, emailed Green as follows:

> Christine confirmed that you made an offer on the property and that it would take approximately 90 days to complete the sale. As I mentioned before, if you are currently living there, as I'm being told you are, you must vacate the property immediately. Once you have successfully acquired the property I will perform an inspection to identify the repairs that will be needed in order for you to occupy it. You will not be provided with City Services (water/sewer) until the repairs have been made and inspected.

DCSMF ¶56.  Around this time, Lorenz began to have discussions with the City Solicitor,[2] Chief

of Police Minch and City Manager Larry Manross concerning Plaintiffs' occupation of the

Property.  *Id.* ¶57.

Lorenz returned to the Property the next day, July 12, 2018, where he again encountered

Green and concluded that she had moved into the residence.  DCSMF ¶59.  Green advised

Lorenz that she had "purchased" the Property, which prompted Lorenz to contact Krzysiak later

that day.  *Id.* ¶¶60-61.  In his email to Krzysiak, Lorenz reported that Green "insisted she

purchased the property," but "could not provide any proof."  ECF No. 82-30.  "Somehow,"

Lorenz wrote, "[Green] has already had the electric turned on but I informed her that she would

not get the water turned on which in itself renders the property uninhabitable."  *Id.*  In response to

Lorenz' inquiry about whether the County anticipated "any issues with the transfer," Krzysiak

advised:

> we won't know until the whole process takes it's [sic] course.  Someone could come
> in and file an exception on the last day.  That would cause us to have to go to a
> hearing before the judge and have another auction.  That process tends to add on
> another two months.

*Id.*

After hearing from Krzysiak and conferring with Minch, Lorenz emailed Green, stating

that "both [Krzysiak] and [Minch] have agreed that you currently have no standing that allows

---

[2] Lorenz has testified that the City Solicitor agreed the Plaintiffs had no legal standing to be at the North Martin Street Property.  *See* DCSMF ¶58.  However, Defendants have not presented any legal written opinion from the City Solicitor to this effect, nor has the City Solicitor been deposed or submitted an affidavit on this matter.  Accordingly, Lorenz' testimony about the City Solicitor's out-of-court statements constitutes inadmissible hearsay.  Because this evidence does not appear to be reducible to admissible evidence at trial, the Court will not consider it in connection with the pending Rule 56 motion.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1246 (3d Cir. 1993) (affirming district court's finding that inadmissible hearsay evidence, which could not be "reduced to admissible form at trial," was incompetent and thus unable to be considered to defeat a motion for summary judgment); *Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 302 (M.D. Pa. 2016) (inadmissible hearsay testimony was not competent evidence at Rule 56 stage); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to...dispute a fact cannot be presented in a form that would be admissible in evidence.").

you to occupy the premises." ECF No. 82-30 at 2. "Therefore," Lorenz advised, "I will be visiting the property tomorrow 7/13 to post an Order to Vacate which will require that you vacate the property immediately and remove your personal belongings. To avoid penalties, including charges for trespass, it is imperative that you seek housing elsewhere." *Id.*

Lorenz also sent separate correspondence to Green advising that she must "immediately vacate" the Property. ECF No. 82-31. The letter stated:

> This action is being taken because you currently have no standing to occupy the property because you have not yet legally acquired it from the Crawford County Tax Claim Bureau. Until that is accomplished, you are considered trespassing on the property. Secondly, and most important, the property is not in habitable condition.
>
> Be advised that in connection with this notice I am required to place an "ORDER TO VACATE" placard on the property and failure to comply will result in prosecution.
>
> In addition, you are required to remove all of the belongings you have brought to the property (inside and outside) within 5 days from the date of this notice.
>
> Once you have legally acquired the property, and provided proof to the City of Titusville that you have done so, you will be given permission to enter it but only for the purpose of making repairs. You will be required to arrange for an inspection to determine the repairs and you will not be authorized to occupy the structure until the repairs have been completed and inspected.

*Id.*

The following day, July 13, 2018, Lorenz and Minch went to the North Martin Street Property to post two Orders to Vacate. DCSMF ¶¶68, 70-71; ECF Nos. 82-32. The Orders stated that the dwelling was "unfit for human habitation, and dangerous to life and health, by reason of want of repair, lack of adequate utilities and fixtures, defects in drainage, plumbing, heating, or construction of said dwelling and premises, and for any other causes affecting public health ...." ECF No. 83-32. Citing Articles 1905.01 and 1907.03 of the municipal housing code, the Orders directed Plaintiffs to immediately vacate the premises and further stated that the

dwelling "shall not again be occupied without written permission from the CITY OF TITUSVILLE." *Id.* While at the Property, Lorenz observed the crawlspace area in the basement where Restivo had been working and noticed "a lot of wires and plumbing that wasn't completed." ECF No. 82-8, Lorenz Depo. at 81:7-21.

Over the ensuing week, Restivo and Lorenz had discussions concerning the Orders to Vacate and Plaintiffs' desire to pursue repairs to the Property, secure a permit, and obtain water service. DCSMF ¶¶74-75. Lorenz advised Restivo that he would not consider Restivo to be the owner of the Property until there had been a deed transfer. ECF No. 82-8, Lorenz Depo. at 63:11-16. He declined Restivo's request for an inspection because he did not want to "go through the house, only to find out [Restivo] was not a successful bidder, and have to do it all over again with the rightful owner." *Id.* at 63:17-25. Lorenz would also have to involve the City's third-party inspector to conduct a UCC inspection. *Id.* at 63:25-64:3. Lorenz reiterated that he would not allow water and sewer services to be turned on at that point. *Id.* at 64:4-6. During a meeting on July 20, 2018, Restivo informed Lorenz that Plaintiffs would be homeless if the Orders to Vacate were enforced. *Id.* at 64:12-14. Lorenz told Restivo there was "nothing [he] could do" because, if he granted a permit, "[t]he liability was on me. If [Restivo] got under there and altered that wiring to the extent that it caused a fire and there was injury or death, I didn't want the liability." *Id.* at 64:16-19.

On July 23, 2018, Plaintiff Restivo faxed a message to the Crawford County Treasurer stating, in part:

> As you are aware, the City of Titusville code enforcement officer (Tim Lorenz) is under the impression that I am trees passing [sic] while on the property and making necessary repairs. Mr. Lorenz has indicated that you have told him that you have not agreed to my being on the property. I understand that that there may be a question of liability should myself or [another] person/s become injured while on

the property prior to full commencement of the deed in my name as well as concerns relating to the possibility of another person/s of interest bidding against me. I assure you that should a party of interest oppose, I am prepared to go above and beyond to secure ownership. AND I assure you that I accept any and all liability in regards to any personal injury or damage to any person/s on the property during repairs, cleaning, etc. In closing, I ask that you please respond via email . . . stating that you acknowledge my bid and intent to purchase, area aware and consent to my presence on said property and acknowledge my assurance of liability.

DCSMF ¶76; ECF No. 82-33.

In response, Krzysiak acknowledged that Plaintiffs had placed a private bid on the Property as of June 29, 2018 through the County Tax Claim Bureau.  Her email continued:

As we have already discussed, this bid must be advertised and notice sent to all parties of interest before a deed can be issued to you. The process is moving along, but is not complete. The process typically takes 90 days from beginning to end if no exception is filed. You are not the owner until you have the deed. I CANNOT give you consent to enter the property. I do not know of any legal standing that allows you to enter this property and make changes to it. If you have further questions about your legal standing. I suggest you contact an attorney to go over your rights in reference to this property.

DCSMF ¶77; ECF No. 82-20.

On July 24, 2018, Defendants Lorenz and Minch went to the Property while Plaintiffs were there and advised them to vacate the Property and to have their possessions removed. DCSMF ¶78.  Upon evicting the Plaintiffs, a padlock and hasp were placed on the door to secure the premises. *Id.* ¶79.  Although Plaintiffs had resided at the house for only a few weeks, they maintain that they were rendered homeless as a result of their eviction.  *Id.* ¶¶80-81. They occasionally returned to the Property thereafter to retrieve personal belongings, visit with neighbors, and check on their cats.  *Id.* ¶84.

On July 30, 2018, Restivo emailed Lorenz again to advise that he had contacted an attorney and was asserting an "equitable interest of ownership" in the Property.  ECF No. 82-35; *see* DCSMF ¶85.  Citing the common law doctrine of "equitable conversion," Restivo

maintained that he had "legal standing" to be present at the Property and therefore did not need Lorenz's consent "to continue repairs and/or occupancy." ECF No. 82-35.

Restivo followed up with another email to Lorenz on August 2, 2018, informing Lorenz that he intended to return to the Property the following day to finish repairs to the plumbing and gas lines and complete construction of a rear wall. ECF No. 82-22 at 10. Restivo indicated that he expected any "blockades/locks or barricades" to be removed beforehand, and he invited Lorenz once again to conduct an inspection of the house. *Id.*

Lorenz replied the next day in an email stating:

Police Chief Minch made it quite clear what the consequences would be if you entered the property prior to obtaining ownership. If you plan to enter it, even to do repairs, you will be doing so at your own risk. No locks or barricades will be removed nor will there be an inspection conducted at this time.

ECF No. 82-22 at 10. Minch, who was copied on Lorenz' email, also cautioned Restivo: "If you enter this home without proper paperwork and water in the home you will be arrested. Unless you can prove you have purchased it and satisfy Mr. [L]orenz you will go to jail." *Id.* at 10-11.

On or around August 17, 2018, Lorenz and Titusville Police Captain Glen Ciccarelli went to the North Martin Street Property to shut off the electricity. DCSMF ¶¶89-90. Lorenz entered the structure through a window, as Plaintiffs had placed a chair in front of the front door from inside the house. *Id.* ¶91. After entering the premises, Lorenz removed the curtains, which he concluded were being used to obstruct the view into the residence and obscure the fact that the electricity was on. *Id.* ¶92. While he was inside the Property, Ciccarelli observed Plaintiffs' possessions there. *Id.* ¶93.

One week later, on August 24, 2018, Plaintiffs went to the Property to retrieve various personal items that they continued to keep there. DCSMF ¶98. Chief Minch and Officer Bean, who were in the area, observed Restivo's truck at the Property and went to investigate. *Id.* ¶¶99-

100. Once at the house, they observed that the Orders to Vacate had been removed, the lights were on, and the padlock had been removed. *Id.* ¶100. After the officers knocked on the door, Restivo opened it and, upon questioning, acknowledged that he still did not have the deed to the Property. *Id.* ¶101. Minch and Officer Bean then arrested Restivo and Green (who was also present) for defiant trespass. *Id.* ¶¶102-103; ECF No. 82-38. Plaintiffs were taken to the city police station, processed, and released after approximately 30 minutes. *Id.* ¶¶104-105. They were permitted to return to the Property to collect some personal items but were instructed that, if they returned again, they would be arrested on more serious trespass charges. *Id.* ¶105. After Plaintiffs were removed, police officer Jason Bean coordinated with the City's public works department to secure the Property against Plaintiffs' re-entry. *Id.* ¶108. The trespass charges were ultimately withdrawn at a later point in time. *Id.* ¶109.

Meanwhile, on August 31, 2018, Ciccarelli and Lorenz convened at the North Martin Street Property when it appeared Plaintiffs had once again accessed the structure. DCSMF ¶111. On this occasion, the padlock had been opened and the power was turned on. *Id.* ¶112. Lorenz entered the premises, shut off the electricity, and re-secured the door. *Id.* ¶113.

Ciccarelli returned to the Property once again on September 1, 2018, after learning from Bean that someone had been playing with the door of the house. DCSMF ¶114. On that occasion, Officer Bean put caution tape up around the front door of the Property and re-secured the lock on the door. *Id.* ¶115. As Ciccarelli was leaving the Property, he encountered Plaintiffs on the street and advised them that they would receive additional charges if they returned to the house. *Id.* ¶116.

Ultimately, Plaintiffs' bid on the Property went unchallenged and, on September 19, 2018, the deed was conveyed to Restivo.  DCSMF ¶119.  The new deed was recorded two days later.  *Id.*

On September 24, 2018, Plaintiff Restivo e-mailed Defendant Lorenz regarding the conveyance and recording of the deed and asked for the lock on the Property to be removed. DCSMF ¶120.  Lorenz responded the following day, stating:

> Christine confirmed that everything is complete on the County's behalf so I am now able to authorize your occupancy of the structure. I removed the City lock weeks ago when the Police Department put up the caution tape because you insisted on continually entering the property without permission. So if there is a lock on it now I'm not aware whose it is. The condition you left the hasp in should make it easy to remove. Now that you have successfully acquired the property you will need to contact me regarding the repairs and arrange to secure a Building Permit.

*Id.* ¶122.  Restivo and Lorenz continued to exchange emails and correspondence in October 2018 concerning their mutual efforts to arrange water service and an inspection of the premises.  ECF No. 82-42.

### C.  *Plaintiffs' Assertion of Permission to Occupy the Property*

In prosecuting their claims, Plaintiffs have maintained that at all relevant times they had the permission of the Tharps to remain at the North Martin Street Property and to conduct any necessary repairs.  The evidence in this case includes testimony from the Plaintiffs, testimony from the Tharps, and a document entitled "Affidavit of Fact."  *See* ECF 82-22.

The latter document consists of a handwritten note stating that "Chris Tharp and Eva Tharp . . . do hereby grant" to Restivo, Green, and Green's children "[p]ermission to use and repair the home located @ 307 North Martin, Titusville PA."  ECF No. 82-22 at 14.  The Tharps further attest that they are "the current assessed owner of [the Property] as of this date and until such property is conveyed to another; Michael Restivo."  *Id.*  The document then lists a

purported date of "Monday 6/25/18"; however, below that date and further down the page is a second date -- "9/10/18" -- with the names "Eva P. Tharp" and "Chris L. Tharp" appearing directly below. *Id.* Thus, the document appears to signify that the Tharps signed the "Affidavit" on September 10, 2018. Their deposition testimony supports this interpretation.

Initially, Chris Tharp testified that he met with the Plaintiffs on only one occasion, that he understood Plaintiffs were in the process of trying to buy the North Martin Street Property, that he gave them permission to look around, but that he never gave them permission to move into the property, store their belongings there, or make repairs. ECF No. 82-2, C. Tharp Depo. at 14:18-20, 17:14-17; 18:6-9; 19:12-20:25. On being shown the "affidavit," Mr. Tharp conceded that he might have given the Plaintiffs permission to undertake repairs, but he had no specific memory of doing so. *Id.* at 24:22-26:7. His best recollection was telling them that, once they got the deed, they could do whatever they wanted. *Id.* at 25:10-15. As to the dates on the "affidavit," Mr. Tharp testified that he probably signed the affidavit on September 10, 2018. *Id.* at 26:21-27:5. He subsequently conceded that he may have met Plaintiffs on two occasions, but he recalled that, at the first meeting, Plaintiffs "were just inquiring" about the Property. *Id.* at 27:15-17, 28:18-29:1. Mr. Tharp recalled confirming that the property was up for sale, but he was not sure who held the deed and advised Plaintiffs they would have to check into that matter. *Id.* at 35:12-18. No permission was given at that time for Plaintiffs to stay at the residence, perform repairs there, or move their belongings inside. *Id.* at 29:2-16. Consequently, Mr. Tharp was not aware that Plaintiffs had moved into the house in the Summer of 2018, or that they had begun repairs. *Id.* at 29:17-30:3. He recalled Restivo mentioning repairs to the Property, but he thought that discussion occurred during their second meeting when the "affidavit" was signed. *Id.* at 30:3-11. He affirmed that nothing in the "affidavit" was untrue. *Id.* at 34:1-4.

Eva Tharp initially testified that she met Plaintiffs on only one occasion; however, she later recalled two meetings -- one in June of 2018 and another in September 2018 when she signed the "affidavit" referenced above.  ECF No. 82-3, E. Tharp Depo. at 10:1-8, 14:11-17:19, 21:1-23:4; 25:10-22, 27:7-11, 28:7-11.  Mrs. Tharp recalled that, at the initial meeting, Plaintiffs inquired about when they could purchase and move into the North Martin Street Property.  *Id.* at 15:14-16:15, 31:24-32:1. Mrs. Tharp advised them that she did not know, but she did not give Plaintiffs permission to move into the home at that time, nor did she discuss repairs with them. *Id.* at 15:20-17:11, 28:24-29:11, 31:24-32:10.  She was unaware that the Plaintiffs had moved into the North Martin Street Property during the summer of 2018.  *Id.* at 29:12-15.  Mrs. Tharp recalled that, during the second meeting in September 2018, the Plaintiffs discussed wanting to perform repairs on the Property and asked her to sign the "affidavit."  *Id.* at 25:18-22, 28:17-23, 30:2-15.  Like her husband, Mrs. Tharp affirmed that everything in the "affidavit" was true.  *Id.* at 26:2-4, 27:2-4.

The upshot of the Tharps' testimony and their "Affidavit of Fact" is that the Tharps gave Plaintiffs permission, as of September 10, 2018, to "use and repair" the North Martin Street Property, as is reflected in the "affidavit."  This inference is consistent both with their written statement and with their collective testimony when fairly considered as a whole.

On the other hand, no reasonable inference can be drawn that Plaintiffs were granted permission to "use" or "repair" the Property prior to September 10, 2018.  The only evidence which Plaintiffs offer in that regard is: (i) Green's testimony that the Tharps gave them "full" permission to use the premises in June of 2018, *see* ECF No. 82-9, Green Depo. at 15:10-22, 22:5-24:5, 34:16-35:21, and (ii) Restivo's testimony that Krzysiak gave him permission that same month to move in and begin repairs, *see* ECF 82-10, Restivo Depo. at 17:5-8, 40:8-9,

50:25-51:4. Restivo's account, however, is belied by Krzysiak's emails dated June 22 and 29, 2018, in which she expressly disclaimed consenting to the Plaintiffs' entrance into the premises. Moreover, Plaintiffs' testimony concerning the alleged out-of-court statements of the Tharps and of Krzysiak constitutes inadmissible hearsay, as those statements are being offered for the truth of the matter asserted -- namely, that the declarants *did* consent to Plaintiffs' continued presence at the Property. *See* Fed. R. Evid. 801(c); *see* also Fed. R. Evid. 802 (general rule rendering of hearsay evidence inadmissible). Plaintiffs' testimony does not fall within any exception to the general rule against hearsay evidence. *See* Fed. R. Evid. 803 and 804. Nor can it be admitted as a non-hearsay prior statement of a witness pursuant to Rule 801(d)(1), because the out-of-court statements at issue were not given under penalty of perjury by the Tharps or by Krzysiak. This is in contrast to the Tharps' sworn deposition testimony and signed "affidavit," both of which can be reduced to an admissible form of evidence at trial.

Accordingly, the record in this case, construed most favorably to Plaintiffs, shows that they had the permission of the Tharps to "use and repair" the home on the North Martin Street Property as of September 10, 2018, but not before. Since the deed to the Property was transferred to Restivo on September 19, 2018, Plaintiffs had permission to occupy the premises for approximately nine days before acquiring legal title.

## II.   **Procedural History**

The operative pleading in this case is the Plaintiffs' complaint, docketed at ECF No. 4. On September 27th, 2019, this Court entered a Memorandum Opinion and Order dismissing certain claims and allowing certain others to proceed to discovery. ECF No. 35. At this juncture, the following claims remain in the case:

(i)   Plaintiffs' Fourteen Amendment substantive due process claim against Defendant Lorenz based upon Plaintiffs' ejectment from the North Martin Street property;

(ii)    Plaintiffs' Fourth Amendment claims against Defendants Minch and Lorenz based upon their alleged false arrest and imprisonment of Plaintiffs;

(iii)    Plaintiffs' Fourth Amendment claims against Defendants Minch, Lorenz, and Ciccarelli based upon their effective "seizure" of the North Martin Street property and exclusion of Plaintiffs therefrom;

(iv)    Plaintiffs' Fourth Amendment claims against Defendants Lorenz and Ciccarelli based upon their warrantless entries into the North Martin Street property; and

(v)    Plaintiffs' state law negligence claims against Defendants Lorenz and Ciccarelli stemming from damage to Plaintiffs' physical property and/or the loss of their pets.

The case proceeded through discovery and, on June 22, 2021, Defendants filed a motion for summary judgment as to all remaining claims. ECF Nos. 81, 82, 83. Plaintiffs filed their opposition on August 17, 2021. ECF Nos. 84, 85. Defendants filed their reply on September 7, 2021. ECF Nos. 86, 87. The contested issues are now sufficiently joined and ripe for adjudication. In the analysis that follows, the Court will discuss only Plaintiff's remaining federal claims, as Plaintiffs did not contest entry of summary judgment on their state law negligence claim.

## III.  **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56). After the moving party has satisfied this burden, the nonmoving party must provide facts showing that there is a genuine issue for trial in order to avoid summary judgment. *Id.* at 324. The nonmoving party must go beyond the pleadings and show specific facts by affidavit or by information in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Id.* at 322. In conducting its analysis, the court must construe the record and any reasonable inferences in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   **Discussion**

### A.   *Governing Principles*

Plaintiffs' federal claims are brought under 42 U.S.C. § 1983, which "is not itself a source of substantive rights," but provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  To prevail under § 1983, a plaintiff must prove that he suffered the deprivation of a right secured by the United States Constitution or federal law by a person acting under color of state law. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

In this case, the parties' dispute concerns whether Plaintiffs have produced evidence sufficient to establish a violation of their federal rights -- specifically, their right to substantive due process and their Fourth Amendment rights to be free from unreasonable searches and seizures.  Even if Plaintiffs have adduced evidence of a constitutional violation, Defendants contend that they are entitled to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*). At summary judgment, the burden is on the officer to establish an entitlement to qualified immunity. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). When multiple officers seek to invoke qualified immunity, the court must separately consider each officer's actions. *Grant v. City of Pittsburgh*, 98 F.3d 116, 122-23 (3d Cir. 1996).

In analyzing whether an official is entitled to qualified immunity we must determine: (1) whether the facts establish the violation of a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021). Courts may begin their inquiry with either prong of the analysis. *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

The court's determination as to whether a particular right was "clearly established" entails a two-step process:

> First, we must define the right allegedly violated at the appropriate level of specificity. This requires us to frame the right in light of the specific context of the case, not as a broad general proposition. Second, we must ask whether that right was "clearly established" at the time of its alleged violation, i.e., whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs ... are irrelevant.

*Peroza-Benitez,* 994 F.3d at 165.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Noonan v. Kane,* No. 20-3610, 2022 WL 2702153, at *6 (3d Cir. July 12, 2022); *Mammaro v.*

*N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016). "Although there need not be a case directly on point for a right to be clearly established, existing precedent must have placed the ... constitutional question beyond debate." *Rivera v. Monko*, 37 F.4th 909, 919 (3d Cir. 2022) (internal quotation marks and citation omitted). "'[C]learly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals.'" *Eades v. Wetzel*, 841 F. App'x 489, 491 (3d Cir. 2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cr. 2020)); *see Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "We may also take into account district court cases, from within the Third Circuit or elsewhere." *Peroza-Benitez,* 994 F.3d at 165–66.

   B.   *Plaintiffs' Substantive Due Process Claim*

   At the Rule 12(b)(6) stage, this Court found that Plaintiffs had pled a plausible Fourteenth Amendment violation under the theory that Lorenz deprived Plaintiffs of substantive due process by effectively excluding them from the North Martin Street Property.  In so concluding, the Court observed that ownership of real property falls within the spectrum of "fundamental rights" to which substantive due process protections apply." *See* Mem. Op. dated Sept. 27, 2019, ECF no. 35 at 18-19 (citing *Nicholas v. Penn State Univ.*, 227 F.3d 133, 143 (3d Cir. 2000) (noting that, in order for a property interest to qualify for protection under the substantive due process clause, it must be "fundamental" under the Constitution); *Joey's Auto Repair & Body Shop v. Fayette Cty.*, No. CV 18-87, 2018 WL 3997124, at *4 (W.D. Pa. Aug. 21, 2018), *aff'd*, No. 18-3087, 2019 WL 4082950 (3d Cir. Aug. 29, 2019) ("'Real property ownership is a property interest worthy of substantive due process protection, as it is unquestionably a fundamental property interest dating back to the foundation of the American colonies.'")). The Court found that *Pivirotto v. City of Pittsburgh*, 528 A.2d 125 (Pa. 1987), lent

support to Plaintiffs' theory that they had acquired equitable ownership rights in the Property pending completion of the statutory sales process. *Id.* at 18. Although the Court cautioned that "further record development and/or briefing may ultimately result in a different conclusion," it found that Plaintiffs had plausibly pled a constitutionally protected property interest. *Id.* At this point in the proceedings, the Court concludes for several reasons that Plaintiffs' substantive due process claim cannot survive.

First, insofar as Plaintiffs allege that their exclusion from the North Martin Street Property amounted to an unlawful seizure in violation of the Fourth Amendment, their Fourth Amendment claim and substantive due process claims are duplicative. When the Government seizes property within the meaning of the Fourth Amendment, the latter provision, not the more generalized notion of "substantive due process," supplies the standard for assessing the constitutionality of the government's conduct. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *Dvortsova v. City of Phila.,* Civil Action No. 21-548, 2022 WL 407637, at *7 (E.D. Pa. Feb. 9, 2022) (Fourth Amendment's protection against unreasonable seizures, rather than protections of substantive due process, governed plaintiff's grievance arising out of the demolition of her real property); *Win & Son, Inc. v. City of Phila.*, 162 F. Supp. 3d 449, 462 (E.D. Pa. 2016) (substantive due process claim arising out of the demolition of plaintiffs' property was subject to Fourth Amendment analysis; court noting that, "[b]y definition, in a case involving the seizure of property, the Fourth Amendment is implicated"). To the extent Plaintiffs' substantive due

process claim is premised on the same alleged misconduct that gives rise to their Fourth Amendment "seizure of property" claim, the former must be dismissed.

Second, the Court is not persuaded at this point in the proceedings that Plaintiffs have demonstrated the deprivation of a fundamental interest to which substantive due process protections apply. In determining that Plaintiffs had alleged a plausible protected interest in the Property under an "equitable conversion" theory, the Court did not definitively rule on the applicability of that doctrine or address whether Defendants would be entitled to qualified immunity. Having now once again reviewed the matter, the Court is not persuaded that the doctrine applies in this case so as to have provided Plaintiffs with a clearly established property interest pending the completion of the county tax sale process.

As Defendants note, Pennsylvania courts apply the doctrine of equitable conversion in situations where the agreement for the sale of property is "unconditional." *See Malkan, Inc. v. Softa*, No. 1435 WDA 2014, 2015 WL 6128784, at *3 (Pa. Super. Ct. July 27, 2015) ("[I]t is well established in Pennsylvania that when an unconditional agreement for the sale of land is signed, the purchaser becomes the equitable and beneficial owner through the doctrine of equitable conversion."). Pennsylvania case law is not entirely clear as to how that rule applies in the context of this case. *Cf. Filsam Corp. v. Dyer*, 422 F. Supp. 1126 (E.D. Pa. 1976) (finding that doctrine of equitable conversion was applicable notwithstanding that buyer's purchase of property was conditional on seller making repairs and alterations to the property, as such conditions were within the control of the parties); *Binswanger of Pennsylvania, Inc. v. TSG Real Est. LLC*, No. 2372 EDA 2015, 2017 WL 6568779, at *7 (Pa. Super. Ct. Dec. 26, 2017) (distinguishing *Filsam* and declining to recognize an equitable conversion because "no Pennsylvania case holding that a condition to a mortgage must be beyond the control of the

parties"), *aff'd on other grounds*, 217 A.3d 256 (Pa. 2019).  Here, Defendants have adduced

evidence that, as of July 13, 2018, the County had made only one of two required notices

regarding the potential sale, and the sale could be objected to by various interested parties or

upset by another bidder.  *See* ECF No. 83 at 5.  Objectors could have petitioned the court to have

the sale set aside which, according to Krzysiak, would have result in another auction.  ECF No.

82-30.  Thus, notwithstanding Restivo's stated intent to outbid any competitors, the

consummation of the sale was contingent upon factors outside the control of the parties and, in

that respect, was not an "unconditional" sale of land.  And even if the doctrine applies in this

case and invested equitable property rights in Restivo (not Green, since she was not a bidder),

this Court does not view those rights as having been so clearly established that a reasonable

official would have understood that Restivo had a fundamental property right in the North Martin

Street Property pending the completion of the sales process.

Apart from that issue, the evidence in this case does not satisfy the standard for

"conscience shocking" behavior on the part of Lorenz.  *See Tomko v. Baldwin Borough*, No. 21-

2593, 2022 WL 1772988, at *1 (3d Cir. June 1, 2022) ("A claim for deprivation of substantive

due process under 42 U.S.C. § 1983 requires the plaintiff to allege that (1) government actors

deprived him of a protected property interest and (2) their behavior 'shocks the conscience.'").

The U.S. District Court for the Eastern District of Pennsylvania has aptly summarized the

applicable legal standards as follows:

> The Third Circuit expressly adopted the shocks the conscience standard for land use actions
> in *United Artists Theatre Circuit, Inc. v. Township of Warrington*, repudiating the "less
> demanding improper motive test" that had previously governed such cases. 316 F.3d 392,
> 400 (3d Cir. 2003) (internal quotation marks omitted). . . .
>
> What shocks the conscience "varies depending on the factual context," *id.* at 285 (quoting
> *United Artists*, 316 F.3d at 400), but the standard encompasses "only the most egregious
> official conduct." *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct.
> 1708, 140 L.Ed.2d 1043 (1998)). Actions taken in violation of state law, in bad faith, due

to improper motive, or based on considerations outside the actor's jurisdiction are generally not sufficiently egregious to shock the conscience. *See United Artists*, 316 F.3d at 402 (citing with approval *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104-05 (8th Cir. 1992); *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir. 1991); *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)); *Corneal v. Jackson Twp.*, 313 F. Supp. 2d 457, 466 (M.D. Pa. 2003), *aff'd* 94 F. App'x 76 (3d Cir. 2004).[1] Absent claims of corruption, self-dealing, bias against an ethnic group, or intent to interfere with constitutionally-protected activity, the Third Circuit and district courts have hesitated to find official behavior in the land use context conscience-shocking. *See Eichenlaub*, 385 F.3d at 286; *Thorpe v. Upper Makefield Twp.*, 271 F. Supp. 3d 750, 755 (E.D. Pa. 2017), aff'd, 758 F. App'x 258 (3d Cir. 2018); *Good v. Trish, et al.*, 2007 WL 2702924, at *6 (M.D. Pa. Sept. 13, 2007) (*quoting Prosperi v. Twp. of Scott*, 2006 WL 2583754, at *4 (W.D. Pa. Sept. 7, 2006)); *Highway Materials, Inc. v. Whitemarsh Twp.*, 2004 WL 2220974, at *13 (E.D. Pa. Oct. 4, 2004), *aff'd*, 386 F. App'x 251 (3d Cir. 2010); *Blain v. Twp. of Radnor*, 2004 WL 1151727, at *4, 5-6 (E.D. Pa. May 21, 2004), *aff'd*, 167 F. App'x 330 (3d Cir. 2006).

Numerous district courts in this circuit have concluded that even official actions alleged to be wrong, unfair, taken in bad faith, or intended to delay do not suffice to shock the conscience, and in each instance these decisions were affirmed. *See Dev. Grp., LLC. v. Franklin Twp. Bd. of Supervisors*, 2004 WL 2812049, at *18 (E.D. Pa. Dec. 7, 2004) (Baylson, J.) (unfair treatment of plaintiffs, however "wrong, mean, or improperly motivated" did not shock the conscience), *aff'd*, 162 F. App'x 158 (3d Cir. 2006); *Blain*, 2004 WL 1151727, at *5 (Kauffman, J.) ("possible impropriety and bad faith" did not "rise to the level of a substantive due process violation"), *aff'd*, 167 F. App'x 330 (3d Cir. 2006); *Levin v. Upper Makefield Twp.*, 2003 WL 21652301, at *9 (E.D. Pa. Feb. 25, 2003) (Davis, J.) (bad motive, purposeful intention to delay permit, and senseless, premature cashing of plaintiff's permit fee check did not shock the conscience), *aff'd*, 90 F. App'x 653 (3d Cir. 2004).

\* \* \*

Several courts in this Circuit have concluded that any relationship between the challenged action and a legitimate government purpose prevents a finding that the conduct shocks the conscience. *See Good*, 2007 WL 2702924, at *6 (dismissing claims because the court could not conclude that the official's "actions bore no reasonable relation to the legitimate government interest in enforcing local land use ordinances"); *Blain*, 2004 WL 1151727, at *6 (concluding that "[d]efendants' pursuit of a legitimate interest through the improper application of the Township's ordinances does not amount to a constitutional violation"); *Corneal*, 313 F. Supp. 2d at 466 (noting that "unless the evidence indicates that the challenged decision is completely unrelated in any way to a rational land use goal, there is no violation of substantive due process").

*E. Rockhill Twp. v. Richard E. Pierson Materials Corp.*, 386 F. Supp. 3d 493, 499 (E.D. Pa. 2019).

Here, the record fails to establish "conscience-shocking" conduct on the part of Lorenz as a matter of law. To the extent Lorenz deprived Plaintiffs of their occupancy of the North Martin

Street Property, the evidence shows that he did so out of concerns about the habitability of the residence.  This was clearly related to the City's legitimate interest in promoting public safety and ensuring compliance with the municipal building and housing codes.  And, to the extent Lorenz deprived Plaintiffs of their "use" of the Property for the purpose of undertaking repairs, the evidence fails to demonstrate that Lorenz was motivated by corruption, self-dealing, ethnic bias, or an intent to interfere with otherwise constitutionally protected activity.  Even assuming that Lorenz was mistaken in believing Plaintiffs needed to perfect their legal title to the Property before having "standing" to obtain building permits and undertake repairs, this does not amount to "conscience-shocking" behavior under the governing legal standards in this circuit.

Finally, Plaintiffs cannot maintain a Fourteenth Amendment claim based on the denial of water and sewer services. Certain property interests "are protected by procedural due process even though the interest is derived from state law rather than the Constitution"; however, "substantive due process rights are created only by the Constitution." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000).  Accordingly, "not all property interests worthy of procedural due process protection are protected by the concept of substantive due process."  *Id.* at 141.  This includes, *e.g.*, important utility services such as water and sewer services.  *See Ransom v. Marrazzo*, 848 F.2d 398, 411-12 (3d Cir. 1988) ("The provision of water and sewer services, whether by a municipality or by a private utility company, is not . . . a federally protected right.").

For these reasons, Plaintiffs have not adduced evidence of a viable Fourteenth Amendment violation.  Even if they had, the Court would find that Lorenz is entitled to qualified immunity because, based on the authority cited above, it would not have been clear to a reasonable officer that Lorenz's actions amounted to a conscience-shocking deprivation of a

protected property interest. Defendants are therefore entitled to an award of summary judgment as it relates to Plaintiffs' substantive due process claim.

### C. Plaintiff's Fourth Amendment Claim Based Upon Unlawful Seizure of their Home

We next address Plaintiffs' Fourth Amendment claim against Defendants Lorenz, Minch, and Ciccarelli based upon their allegedly unreasonable "seizure" of the North Martin Street Property. Although the claim is directed against all three officials, it primarily concerns the conduct of Lorenz, who was responsible for issuing the orders to vacate the Property.

Under the Fourth Amendment, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" [3] *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001) (quoting *United States v. Jacobsen,* 466 U.S. 109, 13 (1984)).

Here, there is little doubt that Lorenz' actions -- particularly his issuance of the orders to vacate the Property substantially interfered with Plaintiff's use and enjoyment of the residence. *See Snyder v. Daugherty*, 899 F. Supp. 2d 391, 410 (W.D. Pa. 2012) ("The participation of a police officer in an improper eviction can constitute a seizure in violation of the Fourth

---

[3] As to this principle, the Court notes that Plaintiffs do not appear to be asserting a Fourth Amendment claim predicated upon the seizure of their personal belongings. In any event, however, such a claim cannot be maintained because the facts show that no "seizure" of Plaintiffs' personal property occurred. Although the record suggests Plaintiffs stored their possessions at the North Martin Street Property, it is significant that, when Lorenz and Minch instructed the Plaintiffs to vacate the premises, they told the Plaintiffs to remove their possessions as well. Thus, the Defendants did not attempt to interfere with Plaintiff's possessory interests in their personal property; on the contrary, Defendants wanted both Plaintiffs and their belongings removed from the premises. Nothing in the record suggests that Defendants took or destroyed any of the personal items that Plaintiffs left behind. In fact, following their arrest, Plaintiffs were permitted to return to the Property to retrieve some of their personal items. To the extent Plaintiffs otherwise lacked access to their personal possessions, that was the result of Plaintiffs' failure to remove them from the Property as directed. Consequently, Defendants are entitled to summary judgment on any claim that is based upon a seizure of the Plaintiffs' personal property or effects.

Amendment.").  But Defendants argue that no "seizure" occurred because Plaintiffs had no legitimate possessory interests in the residence for Fourth Amendment purposes.  Plaintiffs, on the other hand, claim a possessory interest based on permission from the Tharps or through having obtained equitable ownership of the Property.

The Court agrees that Plaintiffs have failed to adduce evidence of a legitimate possessory interest in the North Martin Street Property. The Court has previously determined that the record cannot support a reasonable inference that the Tharps granted Plaintiffs permission to use and repair the Property as of July 13, 2018 when Lorenz issued his orders to vacate. And, as discussed, the Court is not persuaded that the doctrine of equitable conversion afforded Restivo an equitable interest in the Property.  Thus, Restivo and Green did not experience a Fourth Amendment "seizure" insofar as Lorenz delayed their commencement of repairs on the dwelling.

In addition, notwithstanding Plaintiffs' assertion of equitable ownership, neither Restivo nor Green could have had a legitimate possessory interest in inhabiting the Property during the pendency of the sale process, given the condition of the dwelling.  Here, the evidence establishes that the residence on the North Martin Street Property had been in a significant state of disrepair and the conditions of the dwelling violated certain building code requirements, including a lack of running water. See DCSMF ¶¶17-18; ECF No. 82-7, ¶¶11-14.  No major repairs to the Property had been authorized by Lorenz in compliance with the City's building code as of July 13, 2018 when the orders to vacate were posted.  Any property rights Restivo might have possessed would not have afforded Plaintiffs a legitimate possessory interest in inhabiting an otherwise uninhabitable structure.[4]

---

[4] Plaintiffs make much of the fact that Lorenz did not condemn the property or issue code notifications based on the violations that he perceived. But he explained that he did not believe the property was in an imminent state of collapse as would warrant a formal condemnation. And, while Lorenz had not issued any code violation notices or citations based on the conditions of the premises, this was perhaps not surprising since the building had been

To the extent Lorenz' posting of the orders to vacate could be considered a Fourth Amendment "seizure," the evidence establishes that the "seizure" was reasonable as a matter of law. *See Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992) ("[R]easonableness is still the ultimate standard under the Fourth Amendment."); *Dvortsova v. City of Phila.*, No. CV 21-548, 2022 WL 407637, at *7 (E.D. Pa. Feb. 9, 2022) ("To prove the demolition of her property violated the Fourth Amendment, Dvortsova must show the seizure was unreasonable."). An evaluation of reasonableness involves a "careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71. Here, the Lorenz's orders to vacate served the City's compelling interest in promoting public safety and ensuring the enforcement of its housing and building code requirements. By comparison, Plaintiffs lacked any legitimate interest in remaining on the premises under those conditions. *See Snyder v. Daugherty*, 899 F. Supp. 2d 391, 411 (W.D. Pa. 2012) ("[B]ecause the Court concludes that Ms. Snyder enjoyed no legitimate possessory interest in the apartment, she has no private interest to be balanced.").

In sum, the Court finds insufficient evidence in the record to support a Fourth Amendment claim arising out of Lorenz' alleged seizure of the North Martin Street Property, but in the alternative, the Court concludes that Lorenz is protected by qualified immunity. Neither party has identified, and the Court has not located, any precedential opinion or a robust consensus among the Courts of Appeals which would have notified Lorenz that, by posting the orders to vacate and delaying the permitting process until completion of the sale process, he was violating Plaintiffs' clearly established Fourth Amendment rights. Stated differently, the contours of the law were not sufficiently clear to put Lorenz on notice that Restivo's bid endowed the

---

abandoned by the Tharps for some time. The evidence therefore does not support a reasonable inference that Lorenz's concerns about the habitability of the Property were a pretext to evict the Plaintiffs.

Plaintiffs with a clearly established possessory interest in the otherwise uninhabitable premises prior to the passing of legal title.

It necessarily follows from this that Defendant Minch is also entitled to qualified immunity. Minch's liability is predicated on his involvement in: (1) accompanying Lorenz to the Property on July 13, 2018 when the orders to vacate were posted, (2) assisting Lorenz in evicting Plaintiffs from the Property and securing it against entry on July 24, 2018, (3) advising Restivo on August 2, 2018 that he would be arrested if he entered the property, and (4) physically removing Plaintiffs from the Property on August 24, 2018 in connection with their arrest.[5] As the City's building inspector, Lorenz was authorized by law to issue the notices to vacate, and all of Minch's interactions with Plaintiffs regarding the Property occurred on or after that date, when the orders were in effect. The record does not provide any basis to infer that Minch had reason to believe the orders to vacate were not lawfully issued. To the extent Minch prevented Plaintiffs from inhabiting or occupying the dwelling, there was no interference with a legitimate possessory interest for the reasons discussed. Moreover, Minch was not authorized to issue permits pursuant to the building code and could not have allowed Plaintiffs to enter the premises for the purpose of conducting repairs without the approval of Lorenz. Finally, the Court concludes that a reasonable officer in Minch's position would not understand that his conduct as listed above violated a clearly established Fourth Amendment right.

Ciccarelli's involvement in the alleged seizure of the North Martin Street Property is limited to: (1) accompanying Lorenz to the Property on August 31, 2018, when Lorenz re-secured the door, and (2) advising Plaintiffs on September 1, 2018 that they would receive

---

[5] The Court addresses the legality of the Minch's bodily "seizure" of Plaintiffs below in connection with their false arrest claims.

additional charges if they returned to the house.  Again, these actions occurred after Lorenz

issued the orders to vacate on July 13, 2018.  There is nothing to suggest that Ciccarelli had

grounds to believe those orders were unlawful.  And like Minch, Ciccarelli had no authority to

issue permits for the purpose of conducting repairs to the Property.  The Court finds that

Ciccarelli is entitled to qualified immunity because the law as it then existed would not have put

him on notice that his conduct violated clearly established Fourth Amendment rights.

### D.  Plaintiffs' Fourth Amendment Claim Based Upon False Arrest and Imprisonment

We next consider Plaintiffs' Fourth Amendment claims predicated on unlawful "seizure

of their persons."  Specifically, Plaintiffs assert that Defendants Minch and Lorenz[6] violated their

Fourth Amendment rights by subjecting Plaintiffs to a false arrest and imprisonment.[7]

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish:

(1) that there was an arrest; and (2) that the arrest was made without probable cause."  *James v.*

*City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012).  The related claim for false

---

[6] Although the record establishes that Lorenz was not a sworn officer and did was not personally authorized to effectuate an arrest, the evidence also shows that he supplied information material to Minch's decision to arrest the Plaintiffs.  Under the law of this circuit liability can "extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *see Fernandes v. City of Jersey City*, No. 2:16-CV-07789-KM-JBC, 2017 WL 2799698, at *12 (D.N.J. June 27, 2017) (complaint stated claim against mayor for unlawful Fourth Amendment seizure where plaintiff claimed that he was ejected from a public meeting by city police at the direction of the mayor); *cf. Garcia v. City of Paterson*, No. 11-CV-6587, 2015 WL 857801, at *3 (D.N.J. Feb. 27, 2015) (dismissing false arrest claim against defendant who gave information to police relevant to plaintiffs' arrest because he did not "instigate" or "intentionally cause" the arrests).  Accordingly, the Court assumes that Lorenz, like Minch, is subject to potential liability for Plaintiffs' arrest and detention.

[7] Plaintiffs also suggest in their brief that Ciccarelli violated their Fourth Amendment rights on September 1, 2018 when, through a "show of authority" he "conveyed to them that their movement was being restricted."  ECF No. 84 at 21.  To the extent Plaintiffs are trying to assert a false arrest claim against Ciccarelli, the Court notes that no such claim was previously recognized in this case, and the Court will not permit an amendment of the complaint at this late juncture.  The Court has, however, addressed Ciccarelli's conduct in the context of Plaintiff's Fourth Amendment claim predicated on the alleged seizure of their home, as the Court permitted that claim to proceed at the Rule 12(b)(6) stage.

imprisonment arises when officers arrest a person without probable cause and subsequently detain that person pursuant to that unlawful arrest. *See Adams v. Officer Eric Selhorst*, 449 F. App'x 198, 201 (3d Cir. 2011) (*per curiam*).  Here, the parties disagree about whether Plaintiffs' arrest was supported by probable cause.

"'[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  Thus, the probable cause determination "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  Courts must apply a "common sense approach," and a determination as to probable cause must be based on "the totality of the circumstances." *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000).  Arresting officers are entitled to rely on "reasonably trustworthy" evidence. *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) ("Probable cause exists whenever *reasonably trustworthy information or circumstances* within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested.") (emphasis added). "'[T]he standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate.'" *Dempsey,* 834 F.3d at 468 (quoting *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005)).  "The proper inquiry" is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Bowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).  "Because probable cause is an objective standard, an arrest is

lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *D.C. v. Wesby*, 199 L. Ed. 2d 453, 138 S. Ct. 577, 585 (2018) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–155, and n. 2 (2004)).

In this case, Plaintiffs were arrested for defiant trespass. Under relevant Pennsylvania law, the offense of defiant trespass is committed when a person, "knowing that he is not licensed or privileged to do so, ... enters or remains in any place as to which notice against trespass is given by: actual communication to the actor[.]" 18 Pa. C.S.A. § 3503(b)(1)(i).  This Court previously observed that the offense "also includes an element of intent or *mens rea*," and "a defendant who enters a property with a bona fide, good faith (but mistaken) belief that he is entitled to be there cannot be convicted of defiant trespass." ECF No. 35 at 27 (*Commonwealth v. Namack*, 663 A.2d 191, 194-95 (Pa. Super. Ct. 1995) and *Commonwealth v. Wanner*, 158 A.3d 714, 718 (Pa. Super. Ct. 2017)).  Plaintiffs contend that Defendants Minch and Lorenz could not have had probable cause to arrest them for defiant trespass because the Plaintiffs had a good faith belief in their right to enter the premises based on permission they had received from the Tharps and their equitable ownership in the Property. Plaintiffs also point out that neither the Tharps nor the County ever requested that Plaintiffs be prosecuted for trespassing.

Although the Court was satisfied at the Rule 12(b)(6) stage that Plaintiff had pled a plausible false arrest claim, the Court now finds that Defendants are entitled to judgment as a matter of law.  Relevantly, the Plaintiffs' arrest was effectuated on August 24, 2018, after Lorenz had issued the orders to vacate the premises.  By virtue of those lawfully issued orders, Plaintiffs were on notice that the City had deemed the residence uninhabitable and that they were required to vacate and remove their possessions.  Lorenz had also provided written notice to Plaintiffs the day before that he intended to post the orders and that Plaintiffs would be required to vacate the

home.  Subsequently, on July 24, 2018, Lorenz and Minch evicted Plaintiffs from the Property

and instructed them to remove their possessions.  Then, on August 3, 2018 after Restivo had

emailed Lorenz about his intent to return to the Property to conduct repairs, Lorenz reiterated

that Restivo was not permitted to enter the residence.  Separately, Minch emailed Restivo,

warning that he would be arrested if he entered the home.  On August 24, 2018, Minch observed

Restivo's truck at the Property.  Finding Restivo and Green inside, he arrested them both.  These

circumstances were sufficient to warrant a reasonable belief that Plaintiffs were in violation of

the defiant trespass statute, as set forth in 18 Pa. C.S.A. 3503(b)(1)(i).

      Notably, the statute recognizes certain defenses, including abandonment and a reasonable

belief "that the owner of the premises, or other person empowered to license access thereto,

would have licensed him to enter or remain."  18 Pa. Stat. and Cons. Stat. Ann. §3503(c)(1) and

(3) (West).  But as Defendants point out, the abandonment defense is misplaced because

reasonable officers could believe that Plaintiffs were not permitted to occupy an abandoned

structure where their presence would violate the provisions of the City's code as well as the

building official's order to vacate.  Similarly, reasonable officers could conclude that neither the

Plaintiffs' assertions of equitable ownership nor a grant of permission from the Tharps could

override the terms of Lorenz's orders to vacate or the code provisions relating to habitability.

The Court also notes that, at the time of Plaintiffs' arrest, Chief Minch was in possession of

emails indicating that neither Lorenz nor Krzysiak had consented to Plaintiffs' presence at the

dwelling.  ECF No. 82-38.  Nor did Plaintiffs have an unfettered right under the City's building

and housing codes to undertake repairs on their own without proper permits, particularly while

the orders to vacate were in effect. Consequently, a reasonable officer could believe that

Plaintiffs' presence in the dwelling on August 24, 2018 constituted a defiant trespass and that

Plaintiffs lacked a bona fide, good faith basis for believing they were "licensed or privileged" to be there.

Although the law concerning probable cause is well-developed, the Court finds that the facts of this case would not have placed reasonable officers on notice that there was a lack of probable cause to support a charge of defiant trespass. Because reasonable officers would not have understood that arresting Plaintiffs was unlawful, Defendants Minch and Lorenz are entitled to qualified immunity.

### E. Plaintiffs' Fourth Amendment Claims Based Upon Unreasonable Search of their Home

Finally, Plaintiffs claim that Defendants Lorenz and Ciccarelli violated their Fourth Amendment rights when, "on at least two or three occasions, Lorenz, either with Ciccarelli or alone, entered the Property without a warrant." ECF No. 84 at 19.  The evidence shows that, on July 13, 2018, Lorenz posted the orders to vacate and observed what he believed to be unfinished electrical and plumbing work in the crawl space area of the basement. Subsequently, Lorenz entered the residence again on August 17, 2018 after observing that lights were on in the house. Because a chair had been placed up against the door, Lorenz entered through the window, shut off the electricity, and removed curtains that were obstructing the view into the house.  On August 31, 2018, when it appeared that Plaintiffs had once again accessed the residence, Lorenz returned to the Property.  On this occasion, the padlock on the door had been removed and the electricity had been turned back on.  Lorenz entered through the door, shut off the electricity and re-secured the door.

In *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967), cited by Plaintiffs, the Court held that administrative searches conducted pursuant to administrative code inspection programs "are significant intrusions upon the interests protected

by the Fourth Amendment, that such searches when authorized and conducted without a warrant

procedure lack the traditional safeguards which the Fourth Amendment guarantees to the

individual." *Id.* at 534.  The Court qualified its holding as follows:

> [s]ince our holding emphasizes the controlling standard of reasonableness, nothing
> we say today is intended to foreclose prompt inspections, even without a warrant,
> that the law has traditionally upheld in emergency situations. . . . On the other hand,
> in the case of most routine area inspections, there is no compelling urgency to
> inspect at a particular time or on a particular day. Moreover, most citizens allow
> inspections of their property without a warrant. Thus, as a practical matter and in
> light of the Fourth Amendment's requirement that a warrant specify the property to
> be searched, it seems likely that warrants should normally be sought only after entry
> is refused unless there has been a citizen complaint or there is other satisfactory
> reason for securing immediate entry.

387 U.S. at 539-40 (internal citations omitted).  Plaintiffs argue that the warrantless entries in

this case were unreasonable because they were unsupported by any exigent circumstances.

Defendants counter that Plaintiffs' claims must fail because Plaintiffs had no reasonable

expectation of privacy with respect to the dwelling at the Property.  The Court agrees that

Defendants are entitled to summary judgment on this claim.

While it is well-settled that the Fourth Amendment protects both property and privacy

interests, those are personal rights which may not be vicariously asserted. *Eiland v. Jackson*, 34

F. App'x 40, 41 (citing *Soldal v. Cook Cty. Ill.*, 506 U.S. 56, 63 (1992) and *Brown v. United

States*, 411 U.S. 223, 230 (1973)).  Consequently, the "capacity to claim the protection of the

Fourth Amendment depends . . .  upon whether the person who claims the protection of the

Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*,

495 U.S. 91, 95 (1990); *see also Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  This involves a

"'fact-bound question,' dependent upon the strength of interest in the property and the nature of

control that the person exerts over it." *Eiland*, 34 F. App'x at 41.

36

Defendants contend that Plaintiffs lacked any reasonable expectation of privacy at the Property because they had no right to occupy the premises and reside there and were merely trespassing or squatting there at the time of the Defendants' entries.  In support of their position, Defendants cite various decisions holding that trespassers and squatters lack standing to assert Fourth Amendment claims relative to the property they occupy.  *See* ECF No. 83 at 15-16 (citing *U.S. v. Cortez-Dutrieville*, 743 F.3d 881, 885 (3d Cir. 2014) (citing *U.S. v. Jackson*, 585 F.2d 653, 658 (4th Cir. 1978)) (" a trespasser on another's property or an individual on abandoned property lacks an objectively reasonable expectation of privacy in his personal effects stored there); *see also United States v. Murray*, No. 1:10-cr-00024, 2010 U.S. Dist. LEXIS 77954, at *20-25 (D.V.I. Aug. 2, 2010) (recounting extensive federal case law that has found that squatters lack standing under the Fourth Amendment)).  Alternatively, Defendants argue that they are entitled to qualified immunity on this claim.

The Court agrees that Plaintiffs have not demonstrated that they possessed a reasonable expectation of privacy in the North Martin Street Property prior to completion of the county tax sale.  At the time of the challenged conduct, Plaintiffs did not have the permission of the Tharps to use or occupy the residence.  And, as previously discussed, Plaintiffs' assertions of equitable ownership appears to be misplaced based on the facts of this case.  In addition, Plaintiffs were subject to the July 13, 2018 orders to vacate, which directed them to evacuate the Property and remove their personal belongings as the result of various code violations.  Finally, Plaintiffs were consistently advised that local officials did not believe they had an entitlement to remain at the Property in the absence of a deed transfer.  Without an objectively reasonable expectation of privacy in the North Martin Street premises, Plaintiffs cannot show that the Defendants' warrantless entries violated their Fourth Amendment rights.  In the alternative, the Defendants

are entitled to qualified immunity because reasonable officers would not necessarily have understood that Plaintiffs possessed a reasonable expectation of privacy in the North Martin Street Property prior to completion of the county tax sale, or that a warrrantless entry into the premises would violation Plaintiffs' Fourth Amendment rights.

## V.   <u>Conclusion</u>

Based upon the foregoing reasons, Defendants' motion for summary judgment will be granted as to all remaining claims in this case.  An appropriate Order follows.

SUSAN PARADISE BAXTER
United States District Judge